## BAUGHER et v STATE

Ohio Appeals, 2nd Dist, Franklin Co

Nos 2312 & 2313. Decided Nov 4, 1933

John A. Connor, Columbus, Vorys, Sater, Seymour & Pease, Columbus, and Williams, Williams, Klapp & Reynolds, Columbus, for · plaintiffs in error.

Donald J. Hoskins, Prosecuting Attorney, Columbus, Forrest R. Detrick, Worthington, Ralph J. Bartlett, Columbus, and F. Vincent Martin, Columbus, Assistant Prosecuting Attorneys, for defendant in error.

## OPINION

By BARNES, J.

"The whole case therefore turns upon two fundamental propositions:

"(1) Did the defendants have the right to make the loans and were the loans approved by the board of directors;

"(2) Even if the loans were not legally made, did the defendants believe and did they have reasonable grounds for believing that they were legally made, and did they act in good faith in borrowing the money."

After a careful examination of the record we agree with counsel as to the fundamental questions involved.

Very exhaustive, voluminous and helpful briefs have been filed by the respective parties. We think the law on the subject is completely covered and the pertinent legal literature exhausted.

The indictment contained four counts. The trial court entered finding of not guilty on the first and second counts and guilty as to the third and fourth counts. The third count in the indictment, among other things, charged that,

E. M. Baugher and Langdon T. Williams, on or about the 3rd day of February, 1931, the said Baugher "being then and there the president, a director and a member of the executive committee of The Columbian Building & Loan Company, of Columbus, Ohio, a building and loan association duly incorporated and organized and then existing and doing business under the laws of

the state of Ohio, and the said Langdon T. Williams being then and there an officer, to-wit, the executive vice-president and a director and a member of the executive committee of said building and loan association, knowingly, wrongfully, fraudulently and unlawfully did wilfully misapply to and for their own use and benefit, $110,000.00 in the amount of the moneys of the said building and loan association, without the authorization, knowledge, consent or approval of said building and loan association, or of its board of directors or executive committee, and with the intent to injure and defraud the said building and loan association, by the means and in the manner and form following."

(Then follows in the indictment a detailed recital of the manner and method of the claimed misapplication, which it is unnecessary to set forth in detail or substance at this time.)

The fourth count of the indictment covers the same transaction and is identical in its language except that where count number 3 describes the claimed criminal act as "knowingly, wrongfully, wilfully, and unlawfully did wilfully misapply to and for their own use and benefit," count number 4 describes the claimed wrongful act as "knowingly, wrongfully, wilfully, fraudulently and unlawfully did abstract and convert to their own use and benefit."

The law authorizing indictments for the alleged criminal acts will be found in §12472 GC, the pertinent portion of which reads as follows:

"Whoever being a president, director, trustee, member of a committee, secretary, treasurer, attorney or other officer or agent of a building and loan association or savings association as provided by law, embezzles, abstracts or wilfully misapplies any of the moneys, funds or credits thereof, shall be imprisoned," etc.

The following is a short recital of pertinent facts and necessary to a complete understanding as to how the questions arise.

During the month of October, 1930, the defendants had negotiations with a Mr. Van Sickle for the purchase of all of his stock in The Columbian Building & Loan Company of Columbus, Ohio, on the basis of $300,000.00 for 1000 shares, par $100.00 per share, being all the stock then owned and controlled by Mr. Van Sickle. The contract also provided for the transfer of an additional 600 shares at the option price of $105.00. The 1600 shares comprised all the issued and outstanding nonwithdrawable stock of the company. The contract of sale and purchase provided for an appraisal of the assets of the Columbian as a check on its financial statement.

The defendants and their associates appointed an appraiser and Mr. Van Sickle appointed one and work started immediately. The total loans outstanding were something over 8000 in number, and it was soon found that it was not practical to make a separate appraisal on each tract. It was finally determined to select some 125 or 150 tracts wherein the loan exceeded $20,000.00 in each instance. The appraisal on this list disclosed a potential loss of about $1,250,000.00. Mr. Van Sickle was unwilling to accept the appraisal, and as a result on or about the 5th of November a new contract was entered into between the parties, wherein it was provided that $100,000.00 of the $300,000.00 consideration would be deposited in the Columbian in the name of an escrow agent, with the provision that if the losses on the then existing loans, over a period of three years amounted to more than $500,000.00, then and in that event the escrow agent should turn the $100,000.00 to the Columbian to reduce the losses. But in the event the losses over the named period should not be greater than $500,000.00, then the deposit should be delivered to Mr. Van Sickle.

In the negotiations and ultimate purchase of the stock of the Columbian, the defendants were the active moving spirits, although they had others associated with them as advisers and stockholders in sufficient number to organize and officer the company in conformity to the provisions of its Constitution and By-Laws. The defendant E. M. Baugher was elected director and in the organization of the board was selected president and a member of the discount committee. The defendant Langdon T. Williams was elected director and in the organization of the board, after an amendment of the Constitution and By-Laws, was made executive vice president and a member of the executive committee. Following the acquiring of the stock and organization by the Baugher-Williams group, amendments of the Constitution and By-Laws followed very early. This was done in order to conform to the operative ideas of the new group. The amendments covered numerous sections and appear to be very carefully considered and all in order to effectually provide for the desired change in plan of operation.

Under the Van Sickle regime the Colum-

bian had carried three different kinds of stock, all represented by certificates of $100.00 each. And a fourth is sometimes referred to in the evidence as "pass book" subscription. But this latter when paid becomes one of the other three as and when the stock certificate was issued. One class of stock represented the capital of the company and was nonwithdrawable except upon final dissolution and liquidation. A second class of stock was known as withdrawable stock and this provision was written on the back of the certificate. The owner was entitled to cash it at any time. The company had the option to call it in at any time. A third class was known as loan stock. This stock was subscribed by individuals who desired to negotiate loans with the company, and was designated as withdrawable stock. It could be applied on the final payment of the loan and then would be cancelled. If not applied on the payment of loan it would remain as withdrawable stock. It was the policy of the Baugher-Williams group to have but one class of stock, and under the early amendments to the Constitution and By-Laws provision was made for the withdrawal of all other stock either by paying off or converting into certificates of deposit.

It is claimed that by the last of January, 1931, the only stock outstanding was the permanent nonwithdrawable stock, totaling 1600 shares closely held by the defendants and their associates, all of whom were then members of the board of directors.

On November 6, 1930, the defendants Baugher and Williams, together with Henry A. Williams and Frederick N. Sinks, executed their joint note to The Central United National Bank of Cleveland, Ohio, in the sum of $300,000.00 for the purpose of providing themselves with funds to pay the purchase price under the Van Sickle contract. In addition to their personal names, six different items of collateral were put up with the Cleveland bank as additional security. In the collateral was included 1000 shares of the Columbian. The note was for ninety days and thereby would fall due on or before February 5th, 1931.

On February 3, 1931, the defendants, Emmet M. Baugher and Langdon T. Williams, drew from one of the branches of the Columbian the sum of $110,000.00. The checks as issued by Scott M. Swisher, in charge of said branch, were $55,000.00 to Emmet M. Baugher and $55,000.00 to Langdon T. Williams. The checks were properly endorsed and deposited in a Columbus bank in the name of Langdon T. Williams, Trustee,

and on the same or following day the entire amount, together with other funds, was checked out by Mr. Williams to the Central United National Bank of Cleveland as part payment on their note. This action by Mr. Baugher and Mr. Williams is claimed to be an unlawful misapplication and abstraction of the funds of the Columbian. It is further claimed that this action was done knowingly, wrongfully and fraudulently, without the authorization, knowledge, consent or approval of the Building and Loan Association or its board of directors or executive committee, and done with intent to injure and defraud. The defendants deny any wrongful or criminal conduct and claim that the amounts represented loans regularly and legally made to them by the Columbian.

There is very little question or dispute on the facts attending the withdrawal of the $110,000.00 by the defendants.

The uncontradicted evidence discloses that an application for the loan was never presented at a regular or special meeting of the board of directors or discount committee. Nor was it mentioned to any of the individual members of the board of directors or discount committee; neither was it afterwards taken up for ratification by the board of directors or discount committee or the individual members thereof. The members of the board of directors, other than the defendants Baugher and Williams, did not know that the claimed loan had been made until weeks or months afterwards, and then discovered it from other sources than information from the defendants, either or both.

The defendants Baugher and Williams each presented themselves as witnesses in the trial of the case, and were interrogated concerning this $110,000.00, and particularly as to when the contemplated loans were first considered by them and what was said by one to the other or any other officer or employee preceding the actual procuring of the money in two checks of $55,000.00 each. Each admitted that nothing was said to other members of the board of directors. They have little or no recollection as to how or when the subject was considered, or which one first made the suggestion. They do agree that it was only a few days before the loan was actually made.

So far as we learn from the record the first knowledge that any one had, aside from the defendants, concerning the contemplated loan was the day previous to its actual consummation when the defendant Langdon T. Williams told Mr. Swisher that

he and Mr. Baugher were contemplating a collateral loan of $55,000.00 each, and that they would probably make it at the Central Branch, which was in charge of Mr. Swisher. On the day following, the defendant Mr. Langdon T. Williams 'phoned Mr. Swisher to send over to their office for execution two collateral notes of $55,000.00 each, and this request was promptly complied with. Mrs. Kramer, an employee, on request, prepared the notes, carried them to the office of Mr. Langdon T. Williams and Mr. Baugher where they were duly signed and the collateral mentioned in the notes delivered to her by the defendants and then returned by her to the Central Branch where the executed papers and collateral were delivered to Mr. Swisher, the manager in charge. Mr. Swisher examined the notes and collateral, placed the same in the regular files of collateral loans and then caused to be issued two checks to the defendants, respectively, in the sum of $55,000.00 each. The proceeds of these two checks were placed to the credit of the defendant Langdon T. Williams, Trustee, and by him checked out, with other funds, as partial payment on their joint note of $300,-000.00 held by a Cleveland bank.

The question arises at once, by what authority did the defendants procure these pretended loans to themselves.

In Article 6, §7 of the Constitution of The Columbian Building & Loan Company as amended by the Baugher-Williams group, we find the following:

"No loan shall be made until it has been approved by the board of directors or executive committee."

This identical provision was contained in the Constitution prior to the amendment, but other provisions of the section were modified through the amendment.

Secs 9643 and 9675, GC, inclusive, deal with building and loan associations, their organization and powers. In §9657, GC, first paragraph, we find the following:

"To make loans to members and others on such terms and conditions as may be provided by the association and upon the following securities only."

Then follow four subdivisions covering different classes of security or collateral. The first refers to mortgage security, either made directly to the association or made to third persons or corporation and pledged to the association as collateral security. The second is pertinent to the question here involved and is quoted in full:

"Second. Obligations secured by pledge of stock or deposits in such association, but such loans shall not exceed either the paid up value or the withdrawal value of all of such stock or deposits."

The third subdivision refers to obligations secured by securities provided for in §9660 GC; and the fourth is the authority to accept securities such as has been continuously accepted by such association since January 1st, 1913. Neither subdivision 1, 3 nor 4 have any application to the questions here involved.

Attention is again called to the first paragraph in this §9657 GC, wherein it says that loans may be made to members and others "on such terms and conditions as may·be provided by the association."

The Columbian made **provisions** in its Constitution that no loan should be made until it had been approved by the Board of Directors or executive committee. This was the organic law of the association. Sections 34 and 35 of the By-Laws (being the same in the old and new), are cited by defendants as authority for the alleged loans questioned in the indictment. These two sections are quoted in full:

"Section 34. Security. All loans made by this company shall be secured by pledge of pass book or certificate of this company on which there has been paid in a sum equal to the amount loaned which shall be known as temporary loans; or by first mortgage on real estate which shall be known as mortgage loans; or by pledge of such other securities as may be allowed by law which shall be known as collateral loans."

"Section 35. Temporary loans. These loans may be made by the President or Secretary-Cashier at any time when there is money in the treasury not otherwise appropriated and upon such terms and conditions as the Board may from time to time prescribe."

Much evidence has been introduced fully and clearly demonstrating that it was a custom of the officers of the Columbian for many years to make temporary loans on pass books and withdrawable certificates of stock having cash surrender value. In fact this rule was extended to the point of designating an employee to handle this class of loans without even being passed on by the president or secretary-cashier as was provided in §35 of the By-Laws. So long as this custom applied to none other than pass book or certificate expressly containing

a provision that such might be cashed by the holder at any time, no particular harm, injury or damage could possibly come to the association, even though such method was unlawful. The placing of such pass book or certificate as collateral for a loan not exceeding the amount thereof was almost the equivalent of putting up dollar for dollar. It would be a mere routine demanding no exercise of judgment. It would not be necessary to consider the moral or financial responsibility of the borrower. Neither would it be necessary to exercise judgment as to whether or not the association was in position to loan its funds. The By-Laws contained the provision as one of the conditions to make the loan that there should be money in the treasury not otherwise appropriated. The association could have said to this pass book or certificate holder that it would not make the loan, but such pass book or certificate holder could at once say, "I will exercise the right to draw the amount down in cash." And the net results would be the same whether the association permitted the loan or allowed the stockholder to cash his pass book or certificate. There would be the difference that if the holder of such withdrawable stock cashed it before dividend dates he might lose the accrued interest. But the advantage to the association in having a satisfied customer would more than meet this loss, particularly in view of the fact that it advertised and was making temporary loans on its stock. While the By-Laws do not say, nor is there much aid in the record, yet we venture the opinion that this is what was in mind when the question of temporary loans was provided for in the above sections of the By-Laws. The observations that we have made could not possibly apply to nonwithdrawable stock. It had no cash surrender value. As to it there was the positive provision that it could not be withdrawn except on dissolution and liquidation of the association. The association could not deal in this stock. Under **subdivision 2 of §9657, GC,** there was the authority to make loans described by pledge of stock. This provision, however, was subject to the first paragraph of the above section, wherein it was provided that loans were to be made on such terms and conditions as may be provided by the association. The constitution of the association made no limitation on this power except to provide that no loan should be made until it had been approved by the board of directors or executive committee.

If there had been a well established custom known to the defendants of making loans on the pledge of nonwithdrawable stock by the president or secretary-cashier, under the pretended authority of §35, then in a proper case we would be inclined to hold, in the absence of any evidence to the contrary, that such evidence might properly be considered as negativing criminal intent. Throughout the record we do find many witnesses testifying that there was no difference in nonwithdrawable stock and withdrawable stock or pass books as to the right in making a temporary loan. In many instances this was the mere conclusion of the witness, and while we do not question the honesty of such witness, we do want to say that the conclusion is wrong, and that there was no such authority under the law. This class of evidence in the final analysis has no probative force even on the question of intent, when we consider the testimony of witness John B. Dollison, secretary of the Columbian Company eight and one-half years, seven and one-half years being under the Van Sickle control, and one and one-half continuously under the Baugher-Williams control, and a few months after the association was taken over by the Department. At page 210 of the record, Mr. Dollison testified as follows:

"We never had made a loan on permanent stock that I know of."

At another time he does say that a loan was made to himself and also to Mr. Van Sickle, but when made it was on withdrawable stock. Before the loan was paid this stock was transferred to nonwithdrawable and the latter was then attached as the pledge. It was not a new loan on nonwithdrawable stock.

In the instant case the defendants Baugher and Williams did not even follow the provisions of §§34 and 35 of the By-Laws in making their pretended loans,— the provision of §35 wherein it says that temporary loans may be made by the president or secretary-cashier. This cannot be construed as giving to a president authority to make loans to himself. The proposition is so inherently obnoxious that it needs no further argument than the mere statement. This identical question was passed upon by the Court of Appeals of Scioto County in the case of **Young v State, reported in the Ohio State Bar Association Report under date of February 27, 1933, page 1, to be reported in 44 Oh Ap, page 1, (12 Abs 679).** The court therein cites several authorities in support of this principle. That the two defendants did make the loans to them-

selves is conclusive as gleaned from the record. Not even an employee at a window exercised his judgment on behalf of the Columbian. A slight reference is made in the briefs to a theory that Mr. Baugher as President must necessarily have passed on the loan to Mr. Langdon T. Williams, and therefore the Williams loan would come under the provisions of §35 of the By-Laws. This theory is not supported in the evidence. Baugher's testimony relative to the contemplated loan and what was said between him and Williams is met by repeated answers, "I don't know," or "I don't remember." It clearly denies and there is no claim made that he exercised a judgment on behalf of the association. Their plan was joint. The money was sought for a single purpose, that is to pay off a joint obligation at a Cleveland bank. Williams was a participant in the procuring of the Baugher loan and Baugher was a participant in the procuring of the Williams loan. Their action was illegal and we think the irresistible conclusion is that they knew it to be such. Intent is very seldom expressed. It is generally determined by conduct in the line of the surrounding circumstances.

A few of these surrounding circumstances in addition to what has already been said may be referred to. First and foremost is the amount of the withdrawal, which should at once under the conditions call for the very careful consideration and judgment of a disinterested authority before a loan of this size could be made. At this particular time the association was in need of cash and was then or soon afterward a borrower in the sum of two million dollars. The withdrawal of $110,000.00 in this manner impaired the capital structure. No more than four or five mortgage loans had been made by the association since the Baugher-Williams group had taken over the management. Great amounts were weekly and monthly being withdrawn from the association by holders of pass books and withdrawable stock. It is true that much of this was by loans but the holders of such stock were in position to insist on a temporary loan or cash their stock. The refusal to make such loans would probably have closed the door of the association at once. The conduct of the two defendants subsequent to the procuring of the money supports the conclusion of guilty knowledge. We cannot conceive of any justification in the failure to mention at a regular meeting of the directors that such loans had been made. The thought may suggest itself that these two defendants held such

a large proportion of the stock and the other directors a comparatively small portion that thereby the defendants would probably dominate the policy of the association, and possibly be permitted to do so by the other members of the board. The depositors and creditors of the association were entitled to major consideration. Each member of the board of directors would owe a duty to them and in each and every instance he would be expected to exercise an individual judgment as to what would be to the best interests of the association.

Two other propositions receive major attention in the briefs of counsel, but we do not think they are at all determinative. First, it is urged that the action of the defendants and their associates in increasing the value of the building and ground by $240,000.00, and issuing stock therefor to the then holders of the permanent nonwithdrawable stock in proportion to their previous holdings was illegal in that they did not follow the statute and make deductions for losses. Also that the issue of the stock in January before it had been acted upon by the stockholders in February was in direct contravention of law and was not legally issued. A further proposition is advanced that this very stock thus claimed to be illegally issued was pledged by the defendants as security for their two notes totaling $110,000.00. To say the least this action was irregular. The evidence of this character was properly admissible in support of the State's theory that this conduct was in furtherance of a plan and scheme to get in their possession stock available for pledge on the $110,000.00 loan. The circumstances under which the $240,000.00 value was added and stock issued therefor, without an appraisal of the remaining assets of the company and deduction of losses was probably contrary to the provisions of the Code. Capital stock always must be represented by cash value. We do not deem it necessary to make any further comment on this. We are basing our conclusion upon the evidence establishing the fact that the defendants made the loans to themselves and under such circumstances as would make them unlawful regardless of the fact whether the security pledged was legally or illegally issued. In the determination of this case we have had before us the very able opinion of the trial court. In only one particular do we find ourselves at any substantial variance with the trial court, and that is relative to pledging nonwithdrawable stock as security for loans. This,

however, has no bearing on the ultimate determination of the case.

We find no reversible error in the record, and the judgment of the court below will therefore be affirmed.

HORNBECK, PJ, and KUNKLE, J, concur.